# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

TAMARA MURPHY,            )
)
    Plaintiff,          )
)
    vs.            )     Case number 4:13cv1477 AGF
)            TCM
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,    )
)
    Defendant.          )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security ("Commissioner"), denying the application of Tamara Murphy ("Plaintiff") for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1381-1383b, is before undersigned Magistrate Judge for a review and recommended disposition. See 28 U.S.C. § 636(b).

### Procedural History

Plaintiff applied for SSI in January 2010, alleging she was disabled as of June 30, 2008, by migraines, diabetes, cysts in her hands, neuropathy, depression, and reading comprehension problems. (R.[1] at 168-71, 226.) Her application was denied initially and following a December 2011 hearing before Administrative Law Judge ("ALJ") Stephen M.

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

Hanekamp.  (Id. at 18-34, 43-80, 84-88.)  After reviewing additional evidence, see pages 46 to 47, infra, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-4.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Darrell Taylor, Ph.D., C.R.C.,[2] testified at the administrative hearing.

Plaintiff was forty years old at the time of the hearing.  (Id. at 48.)  She is divorced and has one child, a seventeen-year son.  (Id. at 48, 67.)  She and her son have been living with a friend of hers for the past two months.  (Id. at 49.)  The friend has three boys, two of whom live with them.  (Id.)  She had been living in an apartment and paying the rent with child support.  (Id.)  The support had stopped that month.  (Id. at 50.)  She has Medicaid.  (Id.)  Plaintiff completed the twelfth grade.  (Id. at 48.)

Plaintiff last worked one year earlier.  (Id. at 50.)  Asked why all her jobs were short in duration, Plaintiff explained that it was because of her health.  (Id. at 53.)  Specifically, it was because of her insulin-dependent diabetes, migraines, and neuropathy in her feet.  (Id. at 53, 54)  She has had diabetes for approximately ten years.  (Id. at 54.)  She has a headache two to four times a week; each lasts between two hours and all day.  (Id.)  When she has a migraine, she lies in bed with a cold rag over her head.  (Id.)  Her blood sugar levels take two to four hours to go down after she takes insulin.  (Id. at 55.)  In the interim, she is not able to function and tries to sit still.  (Id. at 55-56.)  If the levels are too low, she drinks juice or eats

---

[2]Certified Rehabilitation Counselor.

hard candy. (Id. at 56.) Her blood sugar then takes two to three hours to go back up. (Id.) During this time, she is dizzy and nauseous. (Id.) Plaintiff wears glasses. (Id. at 57.) Approximately three times a week, she has problems with blurred vision. (Id.) Because of her diabetes, she has had cataract surgery in both eyes. (Id. at 57-58.) The neuropathy in her feet makes it hard for her to walk. (Id. at 58-59.) Her feet swell from the ankles to the arches. (Id. at 59.) This happens "[p]retty much every day." (Id.) She then has to prop her feet up to waist level. (Id.) On a typical day, she spends approximately four hours with her feet propped up. (Id.) Also, she has numbness in her hands causing her to drop things. (Id. at 60.) She recently had surgery on her right shoulder. (Id. at 60-61.) Consequently, she cannot lift her shoulder. (Id. at 61.) Medicaid will not pay for her physical therapy. (Id.) Approximately ten years ago, she had surgery on her right elbow. (Id.) She no longer has problems with it. (Id.) She has had carpal tunnel surgery on both sides and trigger finger surgeries on both fifth fingers. (Id. at 62.) She no longer has problems with her trigger fingers. (Id.) She has pain in her hips and has had surgery on her left knee. (Id.)

Plaintiff takes Percocet[3] and tramadol.[4] (Id. at 63.) To help alleviate her pain, she soaks in a tub three to four times a day. (Id.) Almost every day, she uses a heating pad on her shoulder, back, hips, feet, and legs. (Id. at 64.)

---

[3]Percocet is a combination of oxycodone and acetaminophen and is prescribed for the relief of moderate to moderately severe pain. Physicians' Desk Reference, 1096 (65th ed. 2011) (PDR).

[4]Tramadol is prescribed for the relief of moderate to severe chronic pain. PDR at 2888.

Plaintiff began treatment at the Arthur Center in 2010 for depression. (Id.) She sees a nurse practitioner and is taking Celexa[5] and sleeping pills. (Id.) Her depression causes her to cry at least once a day and be angry. (Id. at 64-65) The past year she was hospitalized after trying to commit suicide. (Id. at 65.) In an average week, she spends three days a week in her night clothes. (Id. at 66.)

During a typical day, she tries to do housework, read, or watch television. (Id. at 66-67.) She tries to make supper for her family three or four times a week. (Id. at 67.) She cannot vacuum, dust, or do the laundry. (Id.) She and a friend go grocery shopping. (Id. at 68.)

Ten to fifteen years ago, Plaintiff was in jail for writing bad checks to pay household bills. (Id. at 68-69.)

Mr. Taylor, testifying without objection as a vocational expert ("VE"), was asked to assume a claimant of Plaintiff's age, education, and work experience who can perform light work but cannot climb ladders, ropes, or scaffolds and cannot do overhead tasks on the right. (Id. at 72.) This claimant can occasionally balance, crouch, crawl, kneel, stoop, and climb ramps and stairs. (Id.) She can perform simple, routine tasks with few changes in duties or the work setting and with only superficial interaction with coworkers, supervisors, and the general public. (Id.) Asked if this claimant can perform Plaintiff's past relevant work, he

---

[5]Celexa, a brand name of citalopram, is an antidepressant. Celexa, http://www.drugs.com/celexa.html (last visited July 8, 2014).

replied that she cannot.  (Id. at 73.)  She can, however, perform other work, for instance, housekeeping positions and hand packer positions.  (Id.)

If the hypothetical claimant can stand and walk for a total of four hours in eight, not the six required for light work, the number of available positions would be reduced by half. (Id. at 72, 74.)

All the positions cited by Mr. Taylor require frequent reaching and handling.  (Id. at 74.)  If such can only be performed occasionally, the claimant would not be able to perform the light, unskilled work cited or any other work.  (Id.)  Nor would the claimant be able to perform the work if it needed to be done with the legs elevated to waist level or to a foot or two off the floor.  (Id.)  He explained that the jobs required that the worker stand for a minimum of four hours a day.  (Id.)

Also, the cited jobs allow only a fifteen-minute break in the morning and in the afternoon and a thirty to forty-five minute lunch break.  (Id. at 75.)  If a worker needs additional, unscheduled breaks, for instance, to check her blood sugar levels, she would be fired.  (Id.)  If the worker was absent for a couple of days each month for a period of a couple of months, she would be fired.  (Id.)

The cited jobs exist in significant numbers in the state and national economies.  (Id. at 76.)

The VE further stated that, with one exception, his testimony was consistent with the *Dictionary of Occupational Titles* ("DOT") and *Selected Characteristics of Occupations*.  (Id. at 75.)  The exception is the exertional level for Plaintiff's past relevant work as a certified

medical technician.  As Plaintiff performed it, it is light work; as the DOT classifies it, it is medium work.

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, school records, records from health care providers, and assessments of her physical and mental abilities.

When applying for SSI,[6] Plaintiff completed a Disability Report, listing her height as 5 feet 1 inch and her weight as 200 pounds.  (Id. at 226.)  She stopped working in December 2009 when she was laid-off.  (Id. at 227.)  She believed her impairments prevented her from working as of June 30, 2008.  (Id.)  She had attended special education classes in school. (Id.)  In 1990, she completed the training to be a certified nurse aide.  (Id. at 228.)

On a Function Report completed in March 2010, Plaintiff reported that she lived in a house with her boyfriend and son.  (Id. at 238.)  She described her daily activities as getting up around 5:30 in the morning, drinking coffee, going back to bed at 6:30, getting up again around 9:30, taking a shower, eating, and, with frequent breaks, cleaning the house, including vacuuming and dusting.  (Id.)  Her son helps her care for their dog.  (Id. at 239.)  Before her impairments, she could take long walks, bend, lift, sleep, reach, and push a vacuum.  (Id.) She needs help getting in and out of the tub, combing her hair, and remembering to take her medications.  (Id.)  She prepares a meal monthly; the rest of the time, her son and boyfriend

---

[6]Plaintiff's prior application for SSI was not pursued after its initial denial in July 2009.  (Id. at 222.)  She advised the ALJ that she was not asking that the denial be reopened.

do so. (Id. at 240.) When she does prepare a meal, it takes her a couple of hours because she has to sit and rest. (Id.) Her son and boyfriend also help with the household chores. (Id.) She cannot do any yard work. (Id. at 241.) If the weather is nice, she sits outside and reads a book. (Id.) Her hobbies include fishing, camping, hunting, watching television, and reading books. (Id. at 242.) She needs help with the first three. (Id.) She cannot lift very much, walk very far, and sit for very long. (Id.) Her impairments adversely affect her abilities to lift, bend, reach, sit, climb stairs, squat, kneel, stand, walk, complete tasks, remember, concentrate, use her hands, and get along with others. (Id. at 243.) She cannot pay attention for longer than twenty minutes. (Id.) She does not follow written or spoken instructions well. (Id.) She does not handle stress or changes in routine well. (Id. at 244.)

On a Function Report Adult – Third Party form, Plaintiff's mother-in-law[7] reported that she sees Plaintiff three to four times a week to run errands such as doctors appointments and grocery shopping. (Id. at 261.) Her answers generally mirror Plaintiff's, including the length of time Plaintiff can pay attention. (Id. at 261-69.)

For the years 1990 to 2009, inclusive, Plaintiff's highest annual earnings were $6,893,[8] in 1999. (Id. at 176.) Her next highest were $6,057, in 2009. (Id.) In the eleven years from 1999 to 2009, inclusive, Plaintiff had thirty-five different employers. (Id. at 177-81.)

Plaintiff's school records reflect that she was given the Wechsler Intelligence Scale for Children – Revised ("WISC-R") when she was in the seventh grade. (Id. at 330-39.) She had

[7]According to the report, Plaintiff was then living with a boyfriend.

[8]All amounts are rounded to the nearest dollar.

a verbal intelligence quotient ("IQ") of 70; a performance IQ of 88; and a full scale IQ of 78. (Id. at 330, 3366.) An Individualized Education Program ("IEP") was developed for Plaintiff in the Spring semester of the eighth grade. (Id. at 324-29.) At the time, Plaintiff was in the regular eighth grade math class. (Id. at 325.) She was mainstreamed in the eighth grade Social Studies class and needed special help due to reading problems. (Id.) She showed signs of immaturity, but they were lessening. (Id.) She did not always respond well to criticism. (Id.) An IEP was designed to improve her reading. (Id. at 326-29.)

Plaintiff graduated 77th in a high school senior class of 85. (Id. at 318.) Her Grade Point Average was 1.82. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in June 2007 when Plaintiff was admitted to Franklin Hospital after being seen in the emergency room that night for complaints of worsening abdominal pain and vomiting for the past seven days. (Id. at 340-87.) She was diagnosed with acute non-calculus cholecystitis. (Id. at 341.) It was noted she had Type 2 diabetes, also known as non-insulin dependent diabetes mellitus. (Id.) She was given medication and placed on a liquid diet. (Id. at 355, 365.) An abdominal ultrasound scan did not show any gallstones or any problems with the bile ducts, liver, or kidneys. (Id. at 341, 348.) Plaintiff was discharged the next day with prescriptions for Vicodin,[9] metformin, and Actos.[10] (Id. at 356, 387.) She was to be

_____

[9] Vicodin is a combination of hydrocodone and acetaminophen and is prescribed for the relief of moderate to moderately severe pain. PDR at 573.

[10] Metformin and Actos are each "oral diabetes medicine that helps control blood sugar levels" in people with type 2 diabetes. Metformin, http://www.drugs.com/metformin.html (last visited July

scheduled for a hepatobiliary iminodiacetic acid ("HIDA") to rule out any problems in gallbladder and bile ducts. (Id. at 341, 356)

Plaintiff was seen again at the Franklin Hospital emergency room in October. (Id. at 388-400.) She had severe right lower quadrant abdominal pain with nausea. (Id. at 391.) The pain had started earlier in the day and had become unbearable. (Id.) A computed tomography ("CT") scan of her abdomen and pelvis showed no acute abnormalities. (Id. at 398-99.) Plaintiff was discharged with instructions to follow-up with her primary care physician. (Id. at 400.)

In December, she informed Brian Harrison, M.D., that she had a history of diabetes and fibromyalgia. (Id. at 419-20.) Also, she had trouble sleeping, was emotional, and had had a cortisone shot in her left elbow at Thanksgiving to reduce the pain. (Id. at 419-20.) Plaintiff was prescribed Novolin, a form of insulin. (Id. at 420.) She was to follow-up in one month. (Id.)

She returned to Dr. Harrison in January 2008, consulting him about a nodule on her right wrist and pain in her left elbow. (Id. at 417-18.) She was given Augmentin, a penicillin antibiotic,[11] and referred to an orthopedist. (Id. at 418.)

In February, Plaintiff saw Davis Asbery, M.D., as a new patient for management of hormone replacement therapy. (Id. at 421-25.) On examination, she had no abdominal pain, no nausea or vomiting, no joint pain or stiffness, no anxiety, no depression, and no sleep

_____

8, 2014); Actos, http://www.drugs.com/mtm/actos.html (last visited July 1, 2014).

[11] See Augmentin, http://www.drugs.com/augmentin.html (last visited July 8, 2014).

disturbances.  (Id. at 423.)  Her other systems were also normal.  (Id. at 423, 424.)  She was not in pain.  (Id. at 424.)  Her only diagnosis was diabetes mellitus.  (Id.)  She did not want an annual exam, and wanted only the injection.  (Id. at 421.)  She did not know what medication she was taking.  (Id.)  She was to return after Dr. Asbery had reviewed her medical records.  (Id.)

Plaintiff was seen again at the Franklin Hospital emergency room in March for complaints of abdominal pain with nausea.  (Id. at 401-04.)  The same day, she was seen by Dr. Harrison for the pain and also for fatigue.  (Id. at 415-16.)  She had not used insulin for two days and was not eating.  (Id. at 415.)  She was given Phenergan (an antihistamine) and released from work for three days.  (Id. at 416.)

In May, Plaintiff went to the emergency room at Heartland Regional Medical Center with complaints of right headaches, temporal numbness to the right side of her face, and decreased peripheral vision on the right.  (Id. at 435-36, 438-40.)  She was getting divorced from an abusive husband and was under a lot of stress.  (Id. at 435.)  On examination, her right temple was "very tender to touch."  (Id.)  A CT scan of her head was negative.  (Id. at 436, 440.)  A magnetic resonance imaging ("MRI") of her brain was normal.  (Id. at 439.)  She was to be started on steroids.  (Id. at 436.)

On October 20, she went to the emergency room with complaints of pain in her right hip and foot.  (Id. at 405-08, 459-60.)  X-rays were normal.  (Id. at 407-08, 432-34.)  Three days later, she requested that Dr. Harrison refer her to a foot specialist because there were times when she could "hardly walk."  (Id. at 414.)

November x-rays of her left wrist revealed no fracture or dislocation. (Id. at 430-31.) There was a "mild widening of the scapholunate interval." (Id. at 430.) It was recommended that an orthopedic consultation be considered. (Id.)

On January 21, 2009, Plaintiff consulted John J. O'Connor, M.D., for complaints of a sinus infection. (Id. at 541.) Her current medications included Lexapro,[12] amitriptyline,[13] Premarin (for hormone replacement[14]), Novolin R, and Novolin N. (Id.) She was diagnosed with an upper respiratory infection and sinusitis and prescribed Amoxil (penicillin). (Id.)

Four days later, Plaintiff went to Pike County Memorial Hospital ("PCMH"), reporting that her sinus infection was unrelieved by the earlier-prescribed antibiotics. (Id. at 523-32.) Chest x-rays were normal. (Id. at 530.) She was diagnosed with chronic bronchitis, tobacco abuse, and acute sinusitis. (Id. at 526.) She was told to stop taking the amoxicillin and start taking Cipro (an antibiotic), stop smoking, and take Phenengran with codeine as needed for any pain caused by coughing. (Id. at 527, 532.) She was to follow-up with Dr. O'Connor if she was not better in four to five days. (Id. at 532.)

In February, Plaintiff went to the Pike County Health Department clinic and met with Peggy Summers, R.N., F.N.P. (Id. at 468-70, 473, 483-85.) Plaintiff reported she had been diagnosed with diabetes seven years earlier. (Id. at 469, 483.) She also reported that she

---

[12]Lexapro is an antidepressant prescribed to treat anxiety in adults. Lexapro, http://www.drugs.com/lexapro.html (last visited July 8, 2014).

[13]Amitriptyline is also an antidepressant. Amitriptyline, http://www.drugs.com/amitriptyline.html (last visited July 8, 2014).

[14]See PDR at 3379-86.

occasionally skipped lunch when she was out hunting or fishing. (Id. at 483.) She was very depressed, had financial worries, had pain in her right hip, and had headaches. (Id. at 468.) Her dosages of Celexa and insulin were increased; Ultram[15] was prescribed for her pain. (Id.)

In March, Plaintiff went to the PCMH emergency room for a worsening migraine that had begun that morning. (Id. at 517-22.) Plaintiff was treated with medication and discharged. (Id.) Her home medications included citalopram,[16] amitriptyline, Novolin R, and Novolin N. (Id. at 521.)

In April, Plaintiff met with Ms. Summers and a fitness trainer. (Id. at 465-67, 473, 486-91.) Plaintiff reported feeling depressed and worried about her finances. (Id. at 465.) Her right hip was very painful. (Id.) On a PHQ-9[17] questionnaire, she responded that, over the past two weeks, she had trouble concentrating for less than several days. (Id. at 467.) She also responded that, during that same period, she thought she would be better off dead almost every day. (Id.) Her dosage of Celexa was increased; her prescription for Ultram was renewed. (Id. at 465.) She was also referred to social services. (Id. at 465, 473.) The next day, a social worker met with Plaintiff at her house. (Id. at 471-72.) Most of their conversation focused on Plaintiff's household dynamics. (Id. at 471.) The social worker

---

[15]Ultram is a brand name for tramadol, see note 4, supra. See Ultram, http://www.drugs.com/ultram.html (last visited July 8, 2014).

[16]See note 5, supra.

[17]The PHQ-9 is a self-administered patient health questionnaire used to measure depression. See Kurt Kroenke, M.D., and Robert L.Spitzer, M.D., The PHQ-9: A New Depression Diagnostic and Severity Measure, http://www.lphi.org/LPHIadmin/uploads/.PHQ-9-Review-Kroenke-63754.PDF (last visited June 30, 2014). It has "nine criteria on which the diagnosis of DSM-IV depressive disorder is based." Id.

opined that, although Plaintiff had "some depression issues," she "thrive[d] on chaos and controversy." (Id. at 472.) Plaintiff was given a referral to a counselor. (Id.)

Plaintiff returned to the PCMH emergency room in May after being hit in the head with a rock that flew up when she was using a weed-eater. (Id. at 639-47.) Dermabound skin glue was applied to the abrasion on her scalp, and she was discharged. (Id. at 645.)

In June, Plaintiff told Ms. Summers that she was "[d]oing fairly well on Celexa." (Id. at 653.)

Plaintiff was seen on July 14 at the Hannibal Regional Hospital emergency room for complaints of right arm and leg pain. (Id. at 501-13.) The leg pain had begun twelve hours earlier and was sharp, aggravated by walking and touch, and alleviated by lying down. (Id. at 501.) The arm pain had begun five years earlier and was dull, aggravated by touch and movement, and alleviated by nothing. (Id.) She felt like she was going to get a migraine headache. (Id. at 502.) She denied joint pain or swelling. (Id.) On examination, she had pain in her feet with and without palpation. (Id. at 503.) She also had "some pain" in her hands, but was able to grip the rail and use her hands without apparent pain. (Id.) She was alert and oriented to time, person, and place. (Id.) Plaintiff was given intravenous Benadryl and Compazine, prescribed Neurontin,[18] and discharged within two hours. (Id. at 503, 506, 512.)

---

[18]Neurontin (gabapentin) is prescribed for "a range of neuropathic pain conditions." See Neurontin (gabapentin), http://www.medilexicon.com/drugs/neurontin_783.php (last visited July 8, 2014).

Two weeks later, Plaintiff went to PCMH emergency room, complaining of numbness in her right arm that had become worse during the past two days. (Id. at 613-25.) The dosage of gabapentin, see note 18, supra, was increased. (Id. at 618, 622.) She was discharged with instructions to follow up with Beth Brothers, R.N., F.N.P., in one week. (Id. at 619.)

Plaintiff returned to the PCMH emergency room on August 4 after she became weak when her blood sugar level dropped to 74. (Id. at 603-12.) She would not respond to her family or to emergency room staff. (Id. at 610.) Her family "explain[ed] that [Plaintiff] [was] to go to court in [the] morning [and] [would] probably get arrested if she show[ed] vitals remain stable."[19] (Id. at 611.) After her blood sugar levels increased to 123, Plaintiff was discharged with instructions to continue on her current treatment and to stop smoking. (Id. at 608, 611, 612.)

The next day, Plaintiff met with Ms. Summers. (Id. at 652.) Her dosage of Lantus, an insulin, was increased; her dosage of Celexa was decreased. (Id.) She was to check her blood sugar levels twice a day. (Id.) Her fitness goal was to walk continuously for fifteen to twenty minutes three to four times a day. (Id.)

Five days later, Plaintiff went to the PCMH emergency room with complaints of left shoulder pain after shoveling dirt that weekend. (Id. at 593-602.) X-rays were normal. (Id. at 601.) She was diagnosed with left shoulder strain and discharged with prescriptions for

---

[19]The Court notes that a Tamara J. Roland (Plaintiff's name when married) appeared in the Associate Circuit Court of Audrain County, Missouri, and pled guilty was pled guilty on August 5, 2009, to misdemeanor charges of passing a bad check. See State v. Tamara Jean Roland, Case No. 07U1-CR00343, available at https://www.courts.mo.gov/casenet/cases/charges.do (Mo.Assoc.Cir Ct. 2009).

Flexeril[20] and Vicodin.  (Id. at 598, 602.)  She was also to take Aleve and follow up with Ms. Brothers if not better in four to five days.  (Id. at 602.)

Plaintiff returned the next day, August 11, with complaints of pain in her left hand after she dropped a concrete block on it when getting something out of a deep freezer. (Id. at 578-92.)  The hand was slightly swollen.  (Id. at 587.)  X-rays of the hand and wrist were normal.  (Id. at 589-90.)  Her request for pain medication was declined; she was to take Tylenol.  (Id. at 588.)  Her hand was wrapped in an Ace bandage, which she was to keep on until she was pain-free.  (Id. at 586, 588, 592.)

On September 30, Plaintiff was seen in the PCMH emergency room for pain in her right arm from her elbow to her fingertips.  (Id. at 569-79.)  She had been taking Neurontin, but was still having pain.  (Id. at 571.)  And, she was dropping things held in her right hand. (Id.)  The physician checked with Wal-Mart and was informed that Plaintiff had not had a Neurontin prescription filled for over two and one-half months.  (Id.)  The physician also learned from Dr. Holcomb, in Ms. Brothers' practice, that Plaintiff was on a "no see" list because she was "doctor hopping."  (Id. at 571, 574.)  On examination, Plaintiff initially had a weak grip with her right hand, but when surprised, her grip was strong.  (Id. at 572.)  She had a steady gait.  (Id. at 576.)  Her discharge diagnosis was diabetic neuropathy – noncompliance.  (Id. at 575.)  She was told to take two Aleve three times a day with food and to follow up with a doctor of her choice.  (Id. at 575, 578.)

_____

[20] Flexeril (cyclobenzaprine) is a muscle relaxant.  Flexeril, http://www.drugs.com/search.php?searchterm=flexeril (last visited July 8, 2014).

- 15 -

In October, Plaintiff complained to Ms. Summers of tingling and numbness in her right arm that had begun early that morning.  (Id. at 651.)

Plaintiff was treated on November 18 at the PCMH emergency room for a migraine. (Id. at 559-68.)

She was seen there again the next day, complaining of a headache that had begun two days earlier and that caused occasional blurred vision and dry heaving.  (Id. at 550-58.)  She had a steady gait, but appeared "very unkempt."  (Id. at 557.)  Plaintiff was given Motrin and Benadryl and told to follow-up with her primary care physician in a week.  (Id. at 555.)

Ms. Summers noted the next day that Plaintiff had an eye exam scheduled for the next week.  (Id. at 650.)

The eye exam occurred on December 7.  (Id. at 955-56.)  She was diagnosed with a refractive error, unstable due to fluctuating blood sugar levels, and possible glaucoma.  (Id.)

On December 10, Plaintiff was seen by Janet P. Myers, D.O., for complaints of a headache that had begun the day before.  (Id. at 542.)  She also had neck and back pain.  (Id.) Over-the-counter medications had not given her any relief.  (Id.)  She was diagnosed with cephalalgia (headache[21]) and prescribed Flexeril and tramadol.  (Id.)  She was released to return to work the next day.  (Id.)

X-rays taken of Plaintiff's left hand in January 2010 were normal.  (Id. at 549.)

On March 25, Plaintiff saw Barry J. Gainor, M.D., at the Orthopaedic Clinic at University Hospital because her hands hurt and, sometimes, the fifth fingers "get stuck."  (Id.

---

[21]Stedman's Medical Dictionary, 310 (26th ed. 1995) (Stedman's).

at 666-67.) She was described as having poorly controlled insulin-dependent diabetes. (<u>Id.</u> at 666.) It was noted that she was filing for disability. (<u>Id.</u>) She also had neuropathy in her feet. (<u>Id.</u> at 667.) On examination, she had triggering of the fifth finger of each hand with pain. (<u>Id.</u>) Her right hand was neurovascularly intact. (<u>Id.</u>) Her left hand was not. (<u>Id.</u>) Treatment options were discussed; Plaintiff elected to try night splinting. (<u>Id.</u>) Dr. Gainor noted that she might require a steroid injection in the future. (<u>Id.</u>) She was to return as needed. (<u>Id.</u>)

Two days later, Plaintiff was seen at PCMH emergency room for complaints of epigastric pain that had begun a few weeks earlier. (<u>Id.</u> at 781-95.) Her past medical history included depression and diabetes mellitus. (<u>Id.</u> at 785.) She was in moderate distress. (<u>Id.</u> at 786.) Plaintiff was given Cipro and discharged. (<u>Id.</u> at 790.)

Plaintiff returned to the emergency room on April 2 for abdominal pain and nausea for the past two weeks. (<u>Id.</u> at 709-37.) The pain was an eight on a ten-point scale and was aggravated by eating. (<u>Id.</u> at 721.) She was diagnosed with acute pancreatitis and admitted for further evaluation and treatment. (<u>Id.</u> at 712-13.) An ultrasound of her upper abdomen, including the gallbladder, was unremarkable. (<u>Id.</u> at 714, 729.) Chest x-rays were also unremarkable. (<u>Id.</u> at 730.) Plaintiff's pancreatitis resolved with a clear liquid diet and medication. (<u>Id.</u> at 716, 737.) She was prescribed Darvocet[22] on discharge the next day. (<u>Id.</u> at 732, 737.)

---

[22]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. <u>See</u> <u>Darvocet</u>, http://www.drugs.com/search.php?searchterm=darvocet (last visited July 8, 2014). It was withdrawn from the United States market in November 2010. <u>Id.</u>

After night splinting did not resolve the problem, Plaintiff underwent left fifth finger trigger release surgery by Dr. Gainor on April 19. (Id. at 1000-04.) Ten days later, she reported that she was doing well and wished to have similar surgery on her right trigger finger. (Id. at 1021-23.)

On May 5, Plaintiff consulted William C. Allen, M.D., at the Orthopaedic Clinic for right hip pain for the past two to three years. (Id. at 1024-27, 1058-61.) She smoked one pack of cigarettes a week. (Id. at 1025.) She reported that her ankles "sometimes" swell at the end of the day but go down overnight. (Id.) On examination, she had a good range of motion in her right hip, but complained of pain and pointed to her greater trochanter. (Id. at 1026.) She had normal stability and reflexes. (Id.) Her knee and ankle reflexes were "brisk." (Id.) She had good sensation in her feet and legs and a slight amount of tenderness in her left hip over her greater trochanter. (Id.) X-rays were normal. (Id.) He opined that she had greater trochanter bursitis, which could be treated with exercise and padding her bed. (Id.)

On May 10, Plaintiff underwent right fifth finger trigger release surgery. (Id. at 1004-06.)

The next day, Plaintiff went to the PCMH emergency room with complaints of pain at the site of the operation on her left palm for her trigger finger problem. (Id. at 765-75.) The pain was not responding to Vicodin. (Id. at 774.) Plaintiff explained that she had undergone a similar surgery on her right hand, but did not have similar pain afterwards. (Id. at 769.) The provider called Dr. Gainor, who suggested removing the bandage. (Id.) Plaintiff asked "then what?" and was told that the provider was not her surgeon, had not

examined the site, and had not yet given Plaintiff any pain medication. (Id.) Dr Gainor stated that Plaintiff was welcome to visit him for further evaluation of her pain. (Id.) Plaintiff's pain did respond to the injection she was given of Dilaudid. (Id. at 774.) The site was rewrapped and Plaintiff was discharged with instructions to call Dr. Gainor the next day. (Id.)

On May 18, Plaintiff saw Ms. Brothers, with PCMH Eastern Missouri Health Services ("EMHS"), reporting that she had fallen down the stairs and hurt her back and right shoulder. (Id. at 703, 763-64.) She thought she might have fibromyalgia and wanted gastric bypass surgery or a lap band procedure. (Id. at 703.) Her weight was 200 pounds. (Id.) She had a limited range of motion in her right shoulder. (Id.) X-rays of her sacrumcoccyx revealed lumbosacral degenerative changes, but were otherwise normal; x-rays of her right shoulder were normal. (Id. at 763-64.) She stated that she had an appointment at the Arthur Center to be seen for depression; she was encouraged to keep it. (Id. at 703.) She was also encouraged to walk and stay active. (Id.)

Plaintiff saw Dr. Gainor on May 20 and reported that her hand was fine. (Id. at 1028-29.)

On May 26, she was seen for right foot pain at the Orthopaedic Clinic. (Id. at 1030-32.) The physician, Thomas R. Brant, D.P.M., diagnosed Plaintiff with bilateral plantar fasciitis, told her peripheral neuropathy would not cause it, and advised her to stop wearing flip-flops and sandals and going barefoot and to start wearing supportive shoes. (Id. at 1031.)

When seen again at EMHS on May 27, she was given a sling for her right arm.[23]  (Id. at 702.)

Also on May 27, Plaintiff was seen in the PCMH emergency room for complaints of intermittent, severe abdominal pain with associated nausea.  (Id. at 748-61.)  She smoked one-half packs of cigarettes a day.  (Id. at 752.)  She reported she had a past medical history of fibromyalgia and neuropathy and had been having generalized weakness. (Id. at 757.)  She was given Demerol, Phenergan, and Prilosec, and was discharged within two hours with a prescription for Prilosec and instructions to follow up with Ms. Brothers.  (Id. at 756, 758, 761 .)

Plaintiff had an intake screening at the Arthur Center on June 1.  (Id. at 805-12.)  She reported having symptoms of depression, e.g., low energy, increased appetite, and problems sleeping.  (Id. at 805.)  She was also having difficulties concentrating on tasks.  (Id.)  The symptoms had begun over a year ago.  (Id.)  She was divorced after fourteen years of marriage to an abusive husband and had been living for the past two years with her boyfriend. (Id. at 806.)  Two weeks earlier, she had thought of running the car off the road.  (Id. at 807.) She rarely drank alcohol.  (Id. at 808.)  Virginia Caputy, Ph.D., diagnosed Plaintiff with major depressive disorder, recurrent, moderate, and rated her GAF as being 50.[24]  (Id. at 811.)

---

[23]She was not wearing the sling when she saw Ms. Brothers the next day for a well woman exam; she explained she had forgotten it.  (Id. at 701-02.)

[24]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that

An ultrasound performed the next day of Plaintiff's right upper quadrant was normal, as it had been two months earlier. (Id. at 746.)

Plaintiff was evaluated by Sarmistha Balla, M.D., a psychiatrist with the Arthur Center on June 14. (Id. at 797-98.) She reported being sad and depressed since her divorce two years earlier. (Id. at 797.) She denied any thoughts of hurting herself or others. (Id.) She also reported having been diagnosed with schizophrenia four years earlier. (Id.) She occasionally had auditory hallucinations of her boyfriend's deceased ex-girlfriend talking to her. (Id.) She had trouble trusting people, but was not paranoid. (Id.) She had a history of diabetes, but no other medical problems. (Id.) On examination, Plaintiff was calm, cooperative, and tearful. (Id. at 798.) Her thought process was linear and goal-directed; her thought content was "a little delusion" due to the auditory hallucinations. (Id.) She had a depressed mood, appropriate affect, and fair insight and judgment. (Id.) She was diagnosed with depressive disorder, not otherwise specified ("NOS"),[25] and psychosis NOS. (Id.) Her

---

judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

[25]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category. DSM-IV-TR at 4. This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class. Id.

Cymbalta[26] dosage was increased; her Celexa was increased; Seroquel was added.[27] (Id.) Plaintiff was to return in six-weeks. (Id.)

Two days later, Plaintiff complained to Ms. Brothers of pain in her right shoulder, knees, and legs and of sleep walking she had been doing for years but was really bad lately. (Id. at 700.) X-rays of her knees revealed a left proximal tibial bone lesion but were otherwise normal. (Id. at 741.)

The next day, June 17, Plaintiff consulted Dr. Gainor for soreness in her left calf. (Id. at 1033-34.) She told him that her right trigger finger was doing better and that she had gone target shooting with her boyfriend. (Id. at 1033-34.) Indeed, she showed him the paper targets with "central bull's-eye pellet patterns." (Id. at 1034.) She was sent to the University Hospital emergency room for her complaints of pain and swelling in her left lower extremity that had begun four weeks earlier. (Id. at 996-99, 1062-63.) She had had no prior similar episodes. (Id. at 996.) She had quit smoking three days earlier. (Id. at 997.) An ultrasound was performed to determine whether she had deep vein thrombosis ("DVT"); none was seen. (Id. at 998, 1062-63.) She was discharged home in stable condition. (Id. at 998.)

On June 23, Plaintiff was seen by a psychologist at the Arthur Center. (Id. at 799-804.) She had been in special education classes for reading, writing, and math; had graduated from high school; and had some college credits in medical billing. (Id. at 800.) She was

---

[26]Cymbalta is an antidepressant. See PDR at 1758.

[27]Seroquel is an antipsychotic medicine used to treat schizophrenia and bipolar disorder. Seroquel, http://www.drugs.com/seroquel.html (last visited July 8, 2014).

applying for disability.  (Id.)  Her hobbies included gardening, fishing, deer hunting, and turkey shoots.  (Id.)  She had anger problems with her son.  (Id. at 801.)  She was waiting on an evaluation for bariatric surgery.  (Id. at 802.)  On examination, her appearance was disheveled; her eye contact was average; her judgment and concentration were poor; her affect was labile; her mood was depressed and irritable; and her thought content was hopeless, worthless, and suspicious.  (Id.)  She was diagnosed with major depressive disorder, recurrent, moderate.  (Id.)  Her current GAF was 53.[28]  (Id.)  It was recommended she have individual therapy.  (Id. at 803.)

Plaintiff was seen at the Hannibal Regional Hospital emergency room on July 1 for complaints of abdominal pain for the past two days.  (Id. at 842-61.)  The pain was sharp, pulling, non-radiating, and an eight on a ten-point scale.  (Id. at 842.)  Nothing relieved the pain.  (Id. at 842.)  It was noted that Plaintiff was trying to get disability for neuropathy in her legs.  (Id. at 846.)  She had a normal range of motion in her extremities.  (Id.)  CT scans of her abdomen and pelvis revealed only calcified granulomas at the base of her lungs and mild degenerative disease of her lumbar spine.  (Id. at 851-52, 857.)  Plaintiff was treated with medication, diagnosed with acute pyelonephritis,[29] and discharged home.  (Id. at 855, 860.)

---

[28]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

[29]Acute pyelonephritis is "[a]cute inflammation of the renal parenchyma and pelvis." Stedman's at 1471.  Parenchyma are "[t]he distinguishing or specific cells of a gland or organ . . . ." Id. at 1300.

On July 19, Plaintiff had a neuropathy physical examination by Catherine J. Doty, M.D., at Breakthrough Pain Relief Clinic.  (Id. at 934-46.)  On an intake form, Plaintiff marked that she had frequent depression, but not dizziness, fainting, or recurrent headaches.  (Id. at 936.)  Following a nerve conduction study, she was diagnosed with diabetic neuropathy and pain in both lower extremities.  (Id. at 934, 943-46.)  She was given an ankle block in each foot and was ambulatory when discharged fifteen minutes later.  (Id. at 942.)

Eight days later, Plaintiff saw Dr. Gainor for treatment of a "'knot'" on her left fifth finger and soreness along her right flexor carpi ulnaris tendon area, the latter having been occasionally present for the past two years.  (Id. at 1035-37, 1064-69.)  She was still doing target shooting.  (Id. at 1036.)  Also, she had had an MRI that showed a Baker's cyst[30] in her right knee and wanted to see a knee doctor.  (Id.)  She was given a pamphlet on ganglion cysts and fitted with a flexible right wrist splint.  (Id.)  She was also given an appointment with Kevin M. Marberry, M.D., for her knee.  (Id.)  She was to return to the clinic as needed.  (Id.)

Dr. Marberry saw Plaintiff, noting that she walked with a slight limp and without an assistive device.  (Id. at 1038-41.)  She reported she could not walk two blocks or more without pain and could not walk up stairs due to pain.  (Id.)  She could not sit comfortably for an hour or longer.  (Id.)  Her hobbies included hunting, fishing, camping, dancing, and riding a four-wheeler.  (Id.)  She had an appropriate mood and affect.  (Id.)  She was

_____

[30]"A Baker's cyst is a pocket of fluid that forms a lump behind the knee."  Baker's Cyst – Topic Overview,  http://www.webmd.com/pain-management/tc/bakers-cyst-topic-overview (last visited July 8, 2014).

diagnosed with a posterior knee loose body. (Id. at 1040.) After discussion with Dr. Marberry, Plaintiff elected to proceed with a knee arthroscopy. (Id.)

Plaintiff was seen at the Hannibal Clinic on July 29 for a cyst along her left groin for past three months; the cyst had been decreasing in size during the past two weeks. (Id. at 871-74.) She also reported having chronic anemia and leg pain; she was seeing a physician for chronic pain management. (Id. at 872.) She had diabetes, but denied any hypoglycemic symptoms. (Id.) Her medications included Novolin, Lantus, Celexa, Cymbalta, metformin, Neurontin, tramadol, and amitriptyline. (Id.) Her past medical history included obesity, diabetes mellitus, depression, anxiety, Baker's cyst of the left knee, pancreatitis, and headache. (Id.) She had quit smoking four months earlier. (Id. at 873.) Her gait was normal. (Id.) Plaintiff was diagnosed with folliculitis of the left groin, for which no treatment was necessary as the condition was improving. (Id.) The physician, Meesah Gwan-Nulla, M.D., noted that Plaintiff "really has no clue about diabetic diet," and increased her dosage of Lantus. (Id. at 873-74.) Plaintiff was strongly advised to lose weight, exercise, and walk briskly for thirty minutes five days a week. (Id. at 874.)

On August 1, Plaintiff underwent a left knee arthroscopy, chrondroplasty of the medial femoral condyle, and excision of medial parapatellar soft tissue and medial plica. (Id. at 1007-10.) The postoperative diagnosis was chondromalacia of the knee. (Id. at 1007.)

Plaintiff informed Dr. Marberry on August 13 that she was "doing fairly well." (Id. at 1042-43.) Her knee pain was four on a ten-point scale. (Id. at 1043.) She had tried using

a TENS unit, but stopped because it caused her "too much pain in her lower extremities." (Id.)

Six days later, Plaintiff was seen at the Hannibal Clinic for complaints of sinus and urinary tract problems. (Id. at 863-65.) She was given a prescription for Cipro to treat both infections. (Id. at 863.)

Plaintiff saw Dr. Marberry the next day, reporting that she was still having some problems with neuropathy. (Id. at 1044-45.) He encouraged exercise. (Id. at 1045.)

Plaintiff was seen at the Hannibal Regional Hospital emergency room on September 3 for complaints of knee pain since her surgery. (Id. at 830-41.) She described the pain as acute, stabbing, and a ten on a ten-point scale. (Id. at 830, 836.) It was less when she was not moving. (Id.) Plaintiff reported she was not depressed or anxious. (Id. at 833.) Nor was she having hallucinations or suicidal or homicidal thoughts. (Id.) X-rays of the knee showed proximal tibial bone lesion, minimal degenerative change, and probable small joint effusion. (Id. at 834.) After being given an intravenous injection of Toradol, an anti-inflammatory, and an oral dose of Percocet, Plaintiff's pain was reduced to a three. (Id. at 831.) She was discharged home in stable condition. (Id. at 837.)

Four days later, Plaintiff informed Dr. Marberry that she had had worsening pain over the weekend. (Id. at 1046-48.) She had not been performing her home exercises. (Id. at 1047.) Her knee range of motion was 0-90 degrees with significant pain at terminal flexion. (Id.) She elected to proceed with an intra-articular cortisone injection. (Id.) "[S]he felt

significant pain relief within five minutes." (Id.)  She also had an apprehensive antalgic gait with ambulation.  (Id.)

The next day, September 8, Plaintiff told Dr. Gwan-Nulla at a follow-up visit for diabetes and left knee pain that she had lost thirteen pounds since her last visit.  (Id. at 866-70, 874-75.)  She was able to walk.  (Id. at 875.)  The left knee was not swollen.  (Id.)  9/23, She was to increase the Lantus and follow the American Diabetes Association diet.  (Id.)  During a telephone call two weeks later, Plaintiff informed Dr. Gwan-Nulla that she had not increased her dose of Lantus as instructed.  (Id. at 876.)  She was advised to do so and to also increase her dose of metformin.  (Id.)

On September 27, Plaintiff was seen at the Hannibal Regional Hospital emergency room for complaints of acute left knee pain for the past month.  (Id. at 815, 818-29.)  The pain was a nine on a ten-point scale, aggravated by walking, and alleviated by nothing.  (Id. at 819.)  On a history form, Plaintiff marked as present depression/nervousness, weight loss, fibromyalgia, diabetes, easily bruised, thyroid problems, and feet, hands, and hips problems.  (Id. at 815.)  Not present in the past year were swollen ankles, blurred vision, migraine headaches, and leg or back pain.  (Id.)  Plaintiff was given Percocet, diagnosed with pain in her left knee joint, and discharged within an hour in stable condition and with prescriptions for Vicodin and Naprosyn, a nonsteroidal anti-inflammatory.[31]  (Id. at 819, 822, 823, 824, 827, 828.)

---

[31]See Naprosyn, http://www.drugs.com/search.php?searchterm=naprosyn (last visited July 8, 2014).

On October 5, Plaintiff had a CT scan of her left lower extremity, revealing a lesion in the posterolateral tibial, probably representing an osteoblastoma. (Id. at 816-17.)

The next day, she had a therapy session with Dennis Campbell, M.S.Psy., with the Arthur Center. (Id. at 904.) She reported having had a lot of pain, particularly in her knees. (Id.) She had a flat, negative mood and affect and suppressed tearfulness. (Id.) She was feeling generally unloved. (Id.)

The following day, Plaintiff was seen as a new patient by Dedri M. Ivory, M.D., at the Rheumatology Clinic at University Hospital for evaluation of her left knee pain. (Id. at 1011-18.) Plaintiff reported that she currently took four Vicodin a day. (Id. at 1011.) She was averaging one to two hours of sleep a night. (Id. at 1012.) She had diabetes-related neuropathy with numbness and tingling in her feet. (Id.) She had a history of depression, which had been treated with amitriptyline. (Id.) She had quit smoking six to eight months ago. (Id. at 1013.) On examination, Plaintiff had a flat affect, defensive tone, and was in no acute distress. (Id. at 1014.) She had normal muscle strength in her upper and lower extremities. (Id.) She had mild swelling and warmth in her left knee and was tender on palpation of the knee. (Id.) X-rays of the knee showed mild medial joint space narrowing; small superior and inferior patellar enthesophytes; and a small bony density overlying the posterior joint space, possibly representing a loose body; and a small proximal tibial metaphyseal scherotic density, possibly representing a bone island. (Id. at 1015.) X-rays of her right wrist were normal. (Id.) Dr. Ivory opined that the inferior patellar enthesophyte was the likely cause of her pain. (Id. at 1016.) She also opined that Plaintiff's widespread pain,

fatigue, and poor sleep were suggestive of fibromyalgia.  (Id.)  Lab work was to be done to rule out a vitamin D deficiency.  (Id.)  Plaintiff was given exercises to do at home and was to consider another cortisone injection to her left knee.  (Id.)

One week later, on October 15, Plaintiff informed Dr. Gwan-Nulla that she had not increased her dose of metformin as instructed in September.  (Id. at 876-78.)  She had gained four pounds.  (Id. at 877.)  She denied having any hypoglycemic episodes.  (Id.)  She was to again increase her dose of Lantus, diet, and exercise.  (Id. at 878.)  Her dose of Zocor, to lower cholesterol, was continued and would be increased if lab work did not show her to be at goal.  (Id.)

Plaintiff was seen on November 2 by Ahsan Syed, M.D., at the Arthur Center for a psychiatric evaluation.  (Id. at 887-91.)  She reported that she had unilaterally stopped taking Seroquel and Cymbalta a month earlier because she felt she did not need either.  (Id. at 887.)  She had had sad feelings, depression, crying spells, and low energy and motivation since going through a bad divorce two and one-half years earlier.  (Id.)  "She still ha[d] some down days, but they [didn't] last very long."  (Id.)  She had an occasional low mood, but was able to cope with it.  (Id.)  "[S]he endorse[d] only mild neurovegatative signs of depression."  (Id.)  Her primary concern was her left leg pain; she walked with a cane and was to undergo surgery.  (Id.)  She had had special education for reading, math, and English and had six months of college for medical billing.  (Id.)  She was diagnosed with major depressive

disorder, recurrent, moderate, and psychotic disorder NOS, in remission.  (Id. at 890.)  Her current GAF was 65.[32]  (Id.)  She was prescribed Cymbalta.  (Id.)

Plaintiff consulted Douglas McDonald, M.D., an orthopedic surgeon, on November 10 about her left knee pain.  (Id. at 969-78.)  When completing a history form, she reported that the pain was aggravated by use of the knee and alleviated by pain pills and being off the knee.  (Id. at 974.)  She had not had swollen ankles, headaches, or anxiety in the past thirty days.  (Id. at 978.)  She responded that she smoked one-fourth a pack of cigarettes a day.  (Id. at 977.)  She reported that neither a debridement or cortisone injections had helped.  (Id. at 970.)  After examining Plaintiff and noting that she had a good range of motion in her knee, which was stable, and no current effusion, Dr. McDonald concluded that the lesion appeared to be benign and not responsible for her symptoms.  (Id. at 972-73.)

Plaintiff told Mr. Campbell on November 17 that she had had some "extremely low periods" since her last session, but was currently "feeling some better."  (Id. at 905.)  She wanted to get involved with the Community Support Services ("CSS").  (Id.)

A November 23 bone scan revealed a "[p]robable stress reaction involving the left knee" and "minimal focal uptake in the lesion in the proximal tibia."  (Id. at 814.)  It was thought that the lesion "represent[ed] a chronic osteoid osteoma/osteoblastoma."  (Id.)

_____

[32] A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

Plaintiff saw David Louis Flood, M.D., with the Orthopaedic Clinic on December 1 and reported that she had been using a cane since September. (Id. at 1049-52.) She was referred to Howard G. Rosenthal, M.D., with the Sarcoma Institute, for a second opinion about her left knee pain. (Id. at 1051.)

Plaintiff saw Dr. Rosenthal on December 21 about the lesion found in her proximal left tibia. (Id. at 929-32.) Plaintiff reported that driving her car very far and walking up and down stairs caused her muscular pain. (Id. at 929.) A neurovascular examination was within normal limits. (Id.) Dr. Rosenthal told Plaintiff that her bone lesion was not the cause of her pain. (Id. at 930.) Nor was the lesion active, aggressive, or malignant. (Id.) He was concerned that her pain could be indicative of DVT, but a Doppler study was negative. (Id. at 930-32.)

The next day, Plaintiff met with Ronna Kallmeyer, B.A., with Arthur Center CSS, at Plaintiff's home to discuss her moving out as the friend she was living with verbally abused her and her son. (Id. at 908.) Ms. Kallmeyer helped her fill out low-income housing applications. (Id.)

On January 3, 2011, Plaintiff was seen by Ajay Aggarwal, M.D., and Shaun A. Steeby, M.D., at the Orthopaedic Clinic for left knee pain that started in May 2010. (Id. at 1053-57, 1070-73.) She told them she had been informed that she had a tumor in her bone. (Id. at 1054.) Neither an arthroscopy nor injections had given her any relief. (Id.) She reported that the pain was becoming worse; was constant, sharp, and throbbing; was aggravated by sitting, standing, and walking; and was an eight on a ten-point scale. (Id.) She could not walk long

distances without pain and primarily walked only within her home or indoors. (Id.) She used a cane on long walks. (Id.) When climbing stairs, she had to hold onto the banister and take the steps one at a time. (Id.) She could not sit for longer than thirty minutes. (Id.) She had difficulty with putting on socks and shoes. (Id.) She was taking Vicodin daily for the pain. (Id.) On examination, she was very sensitive and tender to palpation of the knee. (Id. at 1055.) She was "very weak but neurovascularly intact with a motor function on knee extension and flexion as well as 5/5 on ankle and great toe dorsiflexion and plantar flexion." (Id.) She had an active range of motion from 0 to 85 degrees. (Id.) X-rays revealed mild osteoarthritis of the bilateral patellofemoral joints and a sclerotic lesion at the left tibial metaphysis. (Id. at 1055, 1070-73.) Describing her pain as "somewhat out of proportion with her exam and radiographic findings," Dr. Steeby recommended against any surgical intervention. (Id. at 1055.) He offered her an injection, which she declined. (Id. at 1055-56.) She was given an exercise sheet and instructed to bike, swim, and take ibuprofen for pain relief. (Id. at 1056.) She was to return if the pain did not resolve. (Id.)

Plaintiff was seen by Dr. Syed the next day for a review of her medications. (Id. at 892-95.) She reported that she was doing well on the Cymbalta and "her mood symptoms/depression [were] a whole lot better." (Id. at 892.) "She describe[d] her mood as slightly depressed and a trace anxious, with some difficulty with sleep at night on occasion." (Id. at 893-94.) Her flow of thought was logical, goal-directed, and linear. (Id. at 894.) Her

insight, judgment, and impulse control were fair.  (Id.)  Her diagnoses and GAF were as before.  (Id.)  Vistaril[33] was added to her medications.  (Id.)

The next day, Plaintiff consulted Dr. Gwan-Nulla for left knee pain that was an eight on a ten-point scale and right hip pain that was a four.  (Id. at 879-80.)  On examination, her gait was normal.  (Id. at 880.)  Dr. Gwan-Nulla was to obtain records from the orthopedic clinic at Barnes.  (Id.)  She prescribed Plaintiff Ultram for the pain.  (Id.)

On January 6, Plaintiff informed Ms. Kallmeyer that she had been sleeping on the floor and her back hurt.  (Id. at 909.)

Plaintiff was seen at Advanced Eyecare on January 17 for occasional blurred vision for the past few months and pain that radiated from her eyes to the side of her head.  (Id. at 952-53.)  She was diagnosed with cataracts and possible glaucoma.  (Id. at 953.)

On February 7, Plaintiff told Ms. Kallmeyer that she was doing well and taking her medications.  (Id. at 915-16.)

Three days later, Plaintiff had a medication review by Jennifer E. Brockman, M.D., with the Arthur Center.  (Id. at 896-99.)  Plaintiff was reported to having been doing fine, but under a lot of stress because she was moving in two weeks.  (Id. at 896-99.)  Plaintiff reportedly did not like to regularly take Cymbalta, preferred to take Celexa, and did not like Vistaril.  (Id. at 896.)  On examination, Plaintiff was cooperative and had a normal mood, speech, and thought content; appropriate affect and eye contact; a logical flow of thought; and

---

[33]"Vistaril is used as a sedative to treat anxiety and tension" and "may also be used to control nausea and vomiting."  Vistaril, http://www.drugs.com/vistaril.html (last visited July 8, 2014).

fair insight and judgment.  (Id. at 896-97.)  She did not have such symptoms as anger, anxiety, depression, or poor concentration.  (Id. at 896.)  She was well oriented.  (Id. at 897.)  Added to her diagnoses was borderline personality disorder.  (Id. at 898.)  Her current GAF was 45.  (Id.)  Trazodone was added to her medications; Vistaril was discontinued.  (Id. at 899.)

The next week, on February 17, Plaintiff told Ms. Kallmeyer that she had argued with her roommate about him not doing anything around the house and her having to cook and clean.  (Id. at 918.)

The same day, she had a follow-up visit with Dr. Gwan-Nulla.  (Id. at 881-82.)  She did not bring her logbook of her blood sugar levels.  (Id. at 881.)  Although Plaintiff informed her that she was compliant with her diet, she also reported having eaten a sausage biscuit at McDonald's for breakfast.  (Id.)  She denied having had any glycemic episodes.  (Id.)  Plaintiff reported her knee pain had improved; she had a good range of motion in the knee and in her right shoulder.  (Id. at 881-82.)  Dr. Gwan-Nulla opined that part of Plaintiff's uncontrolled diabetes was attributable to her non-compliance with her diet.  (Id. at 882.)  She characterized Plaintiff's knee pain as stable.  (Id.)

Plaintiff had cataract surgery on March 14.  (Id. at 949.)

The next week, she reported to Mr. Campbell that she continued to have low energy and to feel depressed.  (Id. at 907.)  He described her mood as "somewhat irritable and intolerant."  (Id.)

Plaintiff had a follow-up visit with Dr. Gwan-Nulla on March 23 for her diabetes, increased lipids, and right shoulder pain.  (Id. at 883-85.)  Again, she had forgotten her logbook of her blood sugar levels.  (Id. at 884.)  She reported that she "tends to wrestle with her son quite a bit."  (Id.)  She had had one hypoglycemic episode when she had taken her insulin but had not eaten breakfast or lunch.  (Id.)  She was to increase her dosage of Humulin, an insulin, and advised not to take insulin if she was not going to eat.  (Id.)  She was prescribed salsalate, a non-steroidal anti-inflammatory drug, for her right shoulder pain.  (Id. at 885.)

Plaintiff met with Dr. Brockman again on March 24 for a medication review.  (Id. at 900-03.)  Plaintiff reported that she had moved and was happier; however, she still was not sleeping well.  (Id. at 900.)  On examination, she was as before.  (Id. at 900-01.)  Her diagnoses and GAF were also unchanged.  (Id. at 902.)  She was prescribed Celexa and an increased dosage of trazodone.  (Id. at 903.)

Plaintiff told Ms. Kallmeyer on April 1 that she was picking up cans to try to bring in a little extra money.  (Id. at 926.)  The next week, she told her that the sleep medications were working.  (Id. at 927.)

April 12 notes of Advanced Eyecare describe Plaintiff as doing well after her surgery.  (Id. at 948.)

Plaintiff saw Dr. Flood on May 11 for an orthopedic evaluation of her right shoulder problems, i.e., difficulties reaching, pushing, pulling, and carrying.  (Id. at 962-65.)  On examination, the range of motion in her right shoulder was full passively in six directions.

(Id. at 963.) She had tenderness in the acromioclavicular ("AC") joint and with impingement testing. (Id.) X-rays indicated "[m]ild to moderate narrowing of the glenohumeral joint space with small osteophyte at the inferior glenoid articular surface" and mild AC joint arthrosis. (Id. at 965.) An MRI of her right shoulder was ordered to rule out a rotator cuff tear and/or right shoulder impingement. (Id. at 963.) Although Plaintiff was not able to complete the scan, Dr. Flood was able to detect impingement syndrome and possible rotator cuff pathology. (Id. at 966-67.) He recommended diagnostic arthroscopy; Plaintiff agreed. (Id. at 967.)

When Plaintiff saw Dr. Brockman on June 16, she reported that she was sleeping better, coping, and "doing well overall." (Id. at 980-83.) On examination, she was as before. (Id. at 980-81.) As before, she did not have symptoms of anger, anxiety, depression, or poor concentration. (Id. at 980.) Her diagnoses and GAF were unchanged. (Id. at 982.) Her prescription for Celexa was renewed. (Id. at 983.)

On July 15, Plaintiff underwent an arthroscopy with subacrominal decompression and arthroscopic debridement of glenoid labrum tear, following which Dr. Flood diagnosed her with a subacromial impingement of her right shoulder; a superficial partial rotator cuff tear, extrinsic, of her right shoulder; degeneration of base of biceps tendon; and glenoid labrum tear. (Id. at 992-94.) Dr. Flood opined that the AC joint did not need any specific treatment. (Id. at 993.)

Plaintiff informed Dr. Brockman when she saw her on July 21 that she had unilaterally increased the dose of Celexa and she was taking the Cymbalta. (Id. at 984-88, 1075-78.) She

was taking care of a friend who had fallen and broken her hip. (Id. at 984.)  Her mood was anxious, but the other examination findings were as before.  (Id. at 984-85.)

At an August 19 postoperative visit to Dr. Flood, Plaintiff reported that she was "doing somewhat poorly" after trying to catch her mother.  (Id. at 990-91.)  An examination showed weak active abduction and forward flexion, but no neurologic or vascular abnormalities.  (Id. at 990.)

Plaintiff met with Mr. Campbell on September 21.  (Id. at 1079.)  He noted that she had not been to a therapy session since May and had let her medication run out.  (Id. at 1079.)  She had "overdosed on Percocet."  (Id.)  Her affect was not congruent with her conversation – "almost pleased with her decision to take overdose."  (Id.)  She described it as not "'necessarily a bad thing as situation is improved.'"  (Id.)  She did not want to discuss it.  (Id.)  She had a new boyfriend.  (Id.)  Mr. Campbell suspected that the suicide attempt was a way of getting back or gaining control.  (Id.)

Also before the ALJ were reports of non-examining and examining consultants.

One of these reports is an undated vocational evaluation report by Mike Langan, M.D., the first page of which is missing.  (Id. at 444-57.)  Plaintiff reported being unable to stand or walk for longer than fifteen minutes and to sit for longer than forty-five minutes due to diabetic neuropathy.  (Id. at 444.)  She reported difficulty with reading, math, spelling, and "'putting her thoughts on paper.'"  (Id.)  She considered her "disabling condition to be recurring pains in her back, right hip, and other joints, and some problems with memory." (Id. at 445.)  She took insulin for her diabetes.  (Id.)  "[S]he [did] not see herself as having

any serious limitations with respect to functional capacities for self-care, self-direction, work skills, work tolerance, interpersonal skills, or communication." (Id. at 446.) She wanted a job that did not hurt her back. (Id.) On the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), Plaintiff had a full scale IQ of 76, a verbal comprehension score of 70, perceptual reasoning score of 86, working memory score of 69, processing speed of 97, and general ability score of 76. (Id. at 447.) Her full scale IQ score placed her in the borderline range of intellectual functioning. (Id.) On the Wide Range Achievement Test –Fourth Edition ("WRAT 4"), Plaintiff's score on word reading placed her at the equivalent of grade 4.5; of sentence comprehension at the equivalent of grade 6.8; of spelling, at the equivalent of grade 4.4; and of math computation at the equivalent of grade 12.9. (Id. at 448.) Plaintiff's scores on various aptitude and vocational tests suggested that occupations of billing, posting, and calculating machine operators; data entry keyers; statement clerks; tellers; cashiers; production, planning, and expediting clerks; order clerks; and shipping, receiving, and traffic clerks might be possibilities. (Id. at 448-56.) Because of her "rather low scores for full scale IQ, verbal comprehension, working memory, reading, and spelling," "her potential for success at formal occupational training" was questionable. (Id. at 456.)

In June 2009, Plaintiff underwent a psychological evaluation by David Peaco, Ph.D. (Id. at 495-97.) On examination, Plaintiff "had a reduced amount of speech." (Id. at 495.) Her flow of thought was normal; her affect was "somewhat restricted"; her mood was "noticeably depressed." (Id.) She reported having difficulties concentrating and a history of poor reading comprehension. (Id.) She could remember two of three words after ten

minutes.  (Id. at 496.)  Her fund of general information, vocabulary skills, and ability to respond to social comprehension questions were all "a little below average."  (Id.)  "Her overall level of intellectual functioning was below average."  (Id.)  She reported being depressed.  (Id.)  Eight years ago, she had her first panic attack.  (Id.)  She had not had any significant repeats.  (Id.)  She did have frequent problems with chronic anxiety; was often restless, on edge, and irritable; was easily fatigued; and had muscle tension.  (Id.)  Her persistence in tasks was "very poor"; her pace and concentration were "well below average."  (Id.)  She took care of her son.  (Id.)  She was able to clean her house, but did not always do so.  (Id.)  Her chronic physical problems limited her functioning in her job.  (Id.)  Because of hip pain, she did not drive for longer than forty-five minutes at a time.  (Id.)  Dr. Peaco diagnosed Plaintiff with major depression, recurrent, severe, and generalized anxiety disorder.  (Id.)  Her GAF was 45.  (Id.)  He opined that she could understand and remember simple instructions.  (Id. at 497.)  "Her capacity to adapt to the world around her [was] moderately to severely impaired due to physical problems, depression and anxiety, the likelihood of some learning disabilities and clearly a below average level of intellectual functioning."  (Id.)

In February 2010, Plaintiff was evaluated by Karen A. MacDonald, Psy.D., a licensed clinical psychologist, at the request of Pike County Family Support Division.  (Id. at 658-60.)  Plaintiff reported having pain in her back and feet, suicidal ideation, and auditory hallucinations.  (Id. at 658.)  She had been sexually abused by her brother and physically abused by her adoptive father.  (Id.)  Her longest period of employment had been in 1992 when she worked on a farm for a year.  (Id. at 659.)  Her jobs do not last "because of her back

and feet pain as well as migraines." (Id.) She lives with her boyfriend and her son. (Id.) She does most of the chores, albeit slowly. (Id.) Her feet prevent her from enjoying her former activities of hunting, fishing, and camping. (Id.) She has to take medication to sleep. (Id.) She has mood swings. (Id.) On examination, her facial expressions were dull and sad; eye contact was poor; speech was clear, logical, and coherent; mood was depressed with mood swings; affective responses were congruent; thinking, memory, and social skills were impaired. (Id.) She had no difficulty relating to Dr. MacDonald. (Id.) She was oriented to time, place, person, and situation. (Id.) She appeared to be in the low average to borderline range of intellectual functioning with a learning disability. (Id.) Math functions were severely impaired. (Id.) Dr. MacDonald diagnosed Plaintiff with major depressive disorder, recurrent, severe with psychotic features, and mood disorder due to diabetic neuropathy pain. (Id. at 660.) Her GAF was 50. (Id.) She could manage her own funds. (Id.)

The next month, Plaintiff arrived for her psychological evaluation by Frank Froman, Ed.D., a clinical psychologist, a day early, but was seen. (Id. at 672-75.) "She was casually and neatly attired, but of less than optimal hygiene." (Id. at 672.) She reported having four to five migraines a month, each lasting for three to four days. (Id.) She also had diabetes, cysts on her hands, neuropathy affecting her feet, high blood sugar problems, and triggering fifth fingers. (Id.) Her medications included Lantus, Cymbalta, gabapentin, tramadol, metformin, estropipate (a form of estrogen), Novolin R, and meloxicam (a nonsteroidal anti-inflammatory drug). (Id.) She appeared to be "somewhat anxious." (Id. at 673.) Her speech was clear, appropriate, easily understood, relevant, and limited by her "modest IQ." (Id.) She

was neither homicidal or suicidal. (Id.) She smoked one or two cigarettes a day. (Id.) She had a driver's license and drove to the evaluation. (Id.) She slept four hours at night and took a several-hour nap during the day. (Id.) She could take care of her personal grooming tasks, but had trouble combing her hair due to her hands hurting. (Id.) She did routine chores, but took time doing them. (Id.) She had last worked from September to December 2009 at a nursery. (Id.) She drove to the evaluation. (Id.) She complained of depression and of crying "over little things," but Dr. Froman was not able to corroborate the level of depression found by Dr. Peaco. (Id. at 674.) Rather, he found her GAF to be 55 and diagnosed her with chronic dysthmia[34] and generalized anxiety disorder. (Id.) He further found that she could perform simple one and two step assemblies, "to the extent she [was] able to learn them, at or near a competitive rate." (Id.) She could "relate modestly but adequately to coworkers and supervisors." (Id.) She could understand "very simple" oral and written instructions. (Id.) "She acknowledge[d] that were it not for her body's problems, she would be able to work." (Id.) He agreed. (Id.)

In April 2010, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Paul Stuve, Ph.D. (Id. at 687-98.) Plaintiff was assessed as having an organic mental disorder, i.e., borderline intellectual functioning; an affective disorder, i.e., dysthymia; and an anxiety-related disorder, i.e., generalized anxiety disorder. (Id. at 687, 688, 689, 691.) These disorders resulted in mild restrictions in her daily living activities, moderate difficulties in maintaining social functioning, and mild difficulties in

---

[34]Dysthmia is "[a] chronic mood disorder manifested as depression . . . ." Stedman's at 536.

maintaining concentration, persistence, or pace.  (Id. at 695.)  There were no repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Stuve assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two.  (Id. at 684.)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in two of the eight listed abilities, i.e., the ability to carry out detailed instructions and the ability to work in coordination with or proximity to others without being distracted from them.  (Id. at 684-85.)  She was not significantly limited in the other six abilities.  (Id.)  In the area of social interaction, Plaintiff was moderately limited in two of the five listed abilities:  the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors.  (Id. at 685.)  She was not significantly limited in the other three abilities.  (Id.)  In the area of adaptation, she was not significantly limited in three of the four abilities and was moderately limited in her ability to respond appropriately to changes in the work setting.  (Id.)

The same month, a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff was completed by Lindsey Struemph, a single decision maker.[35]  (Id. at 678-83.)  The primary diagnosis was diabetes mellitus; the secondary diagnosis was bilateral trigger fifth

---

[35] See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single-decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

fingers.  (Id. at 678.)  Plaintiff's impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and stand, sit or walk for approximately six hours in an eight-hour day.  (Id. at 679.) Her ability to push and pull was otherwise unlimited.  (Id.)  She had no postural, visual, or communicative limitations.  (Id. at 680-81.)  Her only manipulative limitation was to occasional forceful gripping and grasping.  (Id. at 680.)  Her only environmental limitation was her need for normal breaks for diabetic meals and snacks.  (Id. at 681-82.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her application date of January 14, 2010.  (Id. at 23.)  The ALJ next found that Plaintiff had severe impairments of degenerative joint disease of the right upper extremity and left knee, history of right carpal tunnel syndrome release, trigger fingers, right elbow surgery, plantar fasciitis, diabetes mellitus with neuropathy, obesity, depression, and generalized anxiety disorder.  (Id.)  Her bronchitis and sinusitis were not severe, nor were her scabies,[36] diabetic retinopathy, and history of cataract surgery.  (Id.)  These impairments did not, singly or combined, meet or medically equal an impairment of listing-level severity.  (Id. at 24.)  The ALJ specifically found, inter alia, that Plaintiff did not have an inability to ambulate effectively or to perform fine and gross motor movements.  (Id.)  She did not have a major dysfunction of any joint or any nerve root compression.  (Id.)  Her obesity did not "impose substantial limitations with mobility and stamina or significantly exacerbate [her] other

---

[36]Plaintiff had been treated for scabies twice in April 2011.  (See id. at 958-60.)

- 43 -

medical conditions." (Id.) She did not have "severe, chronic pain or significant range of motion limitation of a weight-bearing joint or the lumbosacral spine." (Id.)

Addressing the issue of Plaintiff's mental impairments, the ALJ found that they resulted in mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, and no limitations in persistence or pace. (Id. at 24-25.) Noting that records of an August 2011 hospitalization for a suicide attempt or of a Percocet overdose were not in evidence, the ALJ found she had not had any episodes of decompensation. (Id. at 25.)

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work[37] except she should not climb ladders, ropes or scaffolds; should only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs. (Id.) She could not do any overhead reaching with her dominant right upper extremity, but she could otherwise reach, hand, and finger frequently (not constantly). (Id. at 25-26.) She could do simple, routine tasks with few changes in duties and settings and could have superficial interaction with coworkers, supervisors, and the general public. (Id. at 26.)

In making this determination, the ALJ considered Plaintiff's credibility. (Id. at 26-32.) After outlining the governing criteria and summarizing her testimony, the ALJ found that "[t]he nature, severity, frequency, duration, and measures used to relieve her complaints are

---

[37] "According to the regulations, 'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." **Holley v. Massanari**, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing Social Security Ruling 83–10, 1983 WL 31251, at *4–5 (S.S.A. 1983)).

not consistent with or supported by treatment notes or by other credibility factors of objective evidence, [Plaintiff's] treatment, signs, medications, or activities of daily living." (Id. at 27.) Her work history was not consistent and included earnings after her alleged disability onset date that were the highest of her lifetime. (Id. at 27-28.) The medical record, summarized in detail by the ALJ, did not support a more restrictive RFC. (Id. at 28-31.) And, there was no medical source limiting her activities of daily living for medical reasons. (Id. at 32.) The ALJ noted that those activities included fishing, camping, and hunting. (Id.)

The ALJ declined to grant Plaintiff's counsel's request that her IQ be tested, finding that she had engaged in substantial gainful activity, had a driver's license, raised children as a single mother, and did not allege any difficulties with activities of daily living caused by a cognitive deficiency. (Id. at 27.)

The ALJ gave Dr. Stuve's opinion about Plaintiff's mental functional abilities weight in that it was consistent with the record. (Id. at 32.) The opinion of the single decisionmaker was given no weight. (Id.)

With her RFC, Plaintiff could not perform her past relevant work. (Id. at 33.) With her age, education, and RFC, she could perform jobs that exist in significant numbers in the national economy as described by the VE. (Id. at 33-34.) Plaintiff was not, therefore, disabled as defined in the Act. (Id. at 34.)

## Additional Medical Records Before the Appeals Council

Plaintiff submitted additional records to the Appeals Council with her request for review. The earliest of these are the September 14, 2011, notes of Dr. Flood when she consulted him for continuing right shoulder pain after trying to catch her mother and for diffuse back pain. (Id. at 1109-13.) On examination, Plaintiff had "some pain" in her shoulder on elevation, but Dr. Flood could not find "any other objective abnormalities." (Id. at 1110.) X-rays showed adequate decompression of the shoulder and "some very mild scoliosis" of her back. (Id. at 1110-13.) Dr. Flood diagnosed lumbar degenerative disease and right shoulder strain. (Id. at 1110.) He prescribed her Vicodin and scheduled her for another appointment in a month, at which time he hoped to do an MRI of her shoulder. (Id.)

The next month, an electromyogram ("EMG") of Plaintiff's right upper extremity and cervical paraspinals was normal. (Id. at 1107-08.) Dr. Flood noted that an "MRI was essentially negative other than mild AC arthrosis." (Id. at 1105-06.) The supraspinatus was fine. (Id. at 1105.) Dr. Flood noted that Plaintiff's "pain now seems to be localized more to the shoulder blade area." (Id.) He diagnosed her with myofascial pain of the right scapula area and possible residual supraspinatus tendinosis. (Id. at 1106.) He gave her a cortisone injection at the superior medial border of the scapula and recommended that three injections be tried before surgery was considered. (Id.)

Plaintiff was seen at the Endocrinology IM Clinic at University Hospital on November 14. (Id. at 1090-1104.) It was noted that she did not test her blood sugar levels every day and averaged one test every other day with intermittent multi-test days. (Id. at 1100.) She

reported she had not had formal diabetes mellitus education. (Id.) She also reported that she lives with her boyfriend, his three children, and her son. (Id. at 1102.) She smoked one pack of cigarettes a week and was trying to quit. (Id.) She had a depressed mood and bilateral foot pain with weight bearing. (Id. at 1103.) Her insulin prescription was changed and she was to return in two months. (Id. at 1104.)

Two days later, Plaintiff reported to Dr. Flood that she had had some relief from the injection but was having pain and discomfort in the right rotator cuff area and the AC joint. (Id. at 1088-89.) He recommended she undergo a repeat arthroscopy with probable distal clavicle excision. (Id. at 1089.) Subsequently, she underwent arthroscopic surgery on December 13, resulting in diagnoses of possible mild subacrominal residual impingement; AC joint disruption; superficial extrinsic tear less that ten percent of supraspinatus; and minor tear at insertion of subcapularis. (Id. at 1082-87.)

## **Standards of Review**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints.  **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 416.920(e).  The burden at step four remains with the claimant to prove her RFC and establish she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 416.920(f).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

## Discussion

Plaintiff argues that the ALJ erred when evaluating her credibility, her RFC, and her mental impairments.

Credibility.  Plaintiff contends that the ALJ erred when evaluating her credibility by not considering the factors set forth in Social Security Ruling 96-7 and by improperly using "boilerplate language" instead.

Before beginning his credibility analysis, the ALJ cited 20 C.F.R. § 416.929 and Social Security Rulings 96-4p and 96-7p.  (See R. at 26.)  The Eighth Circuit Court of Appeals has held that 20 C.F.R. § 416.929[38] and "largely mirror the *Polaski* factors." **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007).  See also **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013) (citing *Polaski* and 20 C.F.R. § 416.929 when discussing ALJ's credibility determination); **Dipple v. Astrue**, 601 F.3d 833, 836 (8th Cir. 2010) (same); **Wiese**, 552 F.3d at 733 (citing SSR 96-7p and *Polaski* when discussing ALJ's credibility determination).  In the Eighth Circuit, an "'ALJ [is] not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints.'" **McDade**, 720 F.3d at 998 (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)) (alterations in original).  "'Because the ALJ [is] in a better position to evaluate credibility, [the Court] defer[s] to his credibility determinations as long as they [are] supported by good reasons and substantial evidence.'"

_____

[38]Plaintiff also argues that the ALJ failed to apply the factors in 20 C.F.R. § 404.1529.  This regulation governs the consideration of applications for disability insurance benefits under Title II of the Act.  The Court assumes that § 416.929, the mirror provision governing Title XVI applications, was the intended cite.

- 52 -

**Id.** (quoting Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006)) (first and fourth alterations in original).[39]

One detracting reason cited by the ALJ when evaluating Plaintiff's credibility was her poor work record. A sporadic work history is a proper consideration when evaluating a claimant's credibility. See **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011); **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010). In an eleven-year period, Plaintiff averaged more than three *new* employers a year. Her second highest earnings during a twenty-year period were not enough for to be considered substantial gainful activity. Citing her own testimony, Plaintiff argues that the history "is consistent with someone who has struggled with Diabetes her whole life." (Pl.'s Br. at 8.) There are two fatal flaws to her argument. First, she informed the health care providers at the Pike County Health Department that she had been diagnosed with diabetes in 2002 and testified in 2011 that she had had diabetes for approximately ten years, yet her earnings record reflects a poor work history since 1990. Second, her second highest annual earnings were in the year after her alleged disability onset date of June 2008. And, in 2008, she had her tenth highest annual earnings in the twenty years reported.

---

[39]Citing the Seventh Circuit case of **Bjornson v. Astrue**, 671 F.3d 640, 644-45 (7th Cir. 2012), Plaintiff contends that the ALJ's credibility determination must be reversed because it is explained only by boilerplate language. That court held in a later decision that reversal is not necessary if the ALJ has "otherwise explained his conclusion adequately." **Filus v. Astrue**, 694 F.3d 863, 868 (7th Cir. 2012). For the reasons set forth below, the ALJ has done so in the instant case.

Plaintiff also contends that the ALJ erred by citing the objective evidence because Social Security Ruling 96-7p "states that the ALJ cannot disregard a claimant's statements . . . *solely* because they are not substantiated by objective medical evidence." (Pl.'s Br. at 8; emphasis added.) As noted above, however, the absence of supporting objective medical is *a* proper consideration when evaluating a claimant's credibility. See **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012). See also **Forte v. Barnhart**, 377 F.3d 892, 895 (8th Cir. 2004) (agreeing with claimant that his allegations of disabling pain could not be discounted "*solely* on the lack of objective medical evidence," but noting that such lack is a proper consideration) (emphasis added). Moreover, in the instant case, Plaintiff's testimony is not only not supported by the objective medical evidence it is inconsistent with such evidence. See **Turpin v. Colvin**, 750 F.3d 989, 994 (8th Cir. 2014) (affirming adverse credibility determination by ALJ when testimony was inconsistent with medical records). For instance, she testified in December 2011 that she has headaches two to four times a week, lasting between two hours and all day and requiring that she lie down. The first complaint of a headache or migraine appears in the medical records for the month before her alleged disability onset date; a CT scan and MRI of her brain were normal. She complained of a headache again in February, March, November, and December 2009. When treated for it in December 2009, she was released to return to work the next day. This was the last treatment for headaches. She noted in July 2010 when seeing a physician specializing in pain management that she did not have recurrent headaches. Ten days later, when seen at an emergency room, she noted that her past medical history included headaches. In September

2010, she noted that she had not had a headache for the past year. Two months later, she marked that she had not had a headache for the past thirty days. See **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005) (affirming ALJ's adverse credibility determination based, in part, on inconsistency between claimant's allegations and objective medical evidence including, inter alia, "documented inconsistent statements to medical professionals"). This inconsistency between her testimony about the debilitating affects of various impairments and the relevant objective medical evidence repeats itself throughout the administrative record. Another example is her testimony about her ankles swelling "[p]retty much every day" and requiring that her feet be propped up to waist level. (R. at 59.) The medical evidence, including Plaintiff's own reports to health care providers, does not generally reflect such a condition. Also, the Court notes that when specifically seeking treatment in July 2010 for pain in her feet, Plaintiff was able to walk within fifteen minutes of being given an ankle block and did not return for further treatment.

Plaintiff next argues that the ALJ ignored Eighth Circuit precedent holding that the ability to do light housework does not equate to an ability to engage in substantial gainful activity, see **McCoy v. Schweiker**, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), when finding that her activities of daily living detracted from her credibility. This argument, however, is circuitously based on her own testimony about her daily activities. The record paints a different picture. For instance, Plaintiff reported when applying for SSI that she did not do yard work, but she sought medical treatment once for shoulder pain after shoveling dirt and once for a head injury sustained when using a weed-eater. She reported that she cannot

sit for very long, but the record includes references to Plaintiff's *current* hobbies including hunting, fishing, and riding a four-wheeler. She reported she cannot stand for very long, but she goes target shooting. She testified that she cannot vacuum or dust, but complained to a health care provider of having to do all the housework. And, at one point, she was caring for a friend who had broken her hip. And, she liked to wrestle with her teenage son. See **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

Additionally, the Court notes that other proper considerations detracting from Plaintiff's credibility are her leaving work for a reason (she was laid off) unrelated to her alleged impairments, see **Kelley v. Barnhart**, 372 F.3d 958, 961 (8th Cir. 2004); her noncompliance with her diabetic treatment regimen, see **Kisling v. Chater**, 105 F.3d 1255, 1257 (8th Cir. 1997); the absence of any restrictions placed on her by her health care providers, see **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999); and the advice of such providers to exercise, see **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013).

Plaintiff further argues that the ALJ erred when discounting her mother-in-law's report supporting her disability claims on the grounds that her mother-in-law is not medically-trained and has affection for Plaintiff. The observations of third-parties may support a claimant's credibility, see 20 C.F.R. § 416.929(c)(3) (listing information from other people about a claimant's pain or other symptoms as a factor to be considered when evaluating a claimant's credibility), but the ALJ did not commit reversible error when not weighing Plaintiff's mother-

in-law's report in her favor. The report echoed the statements in Plaintiff's report about her symptoms and their effects. In **Buckner**, 646 F.3d at 559-60, the Eighth Circuit held that an ALJ's failure to specifically address supporting claims by the claimant's girlfriend about his condition when those statements could be discredited for the same reason as had the claimant's statements. In the instant case, unlike in **Buckner**, the ALJ did specifically address the mother-in-law's report. And, the statements in that report, the same as those of Plaintiff's, could be discredited for the same reasons given by the ALJ when considering Plaintiff's statements.

RFC. "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). "[S.S.R. 96-8p] cautions that a failure to make the function-by-function assessment could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1).

An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed

to have implicitly found no limitation in the latter.  **Id.** at 567-68.  See also **Renstrom**, 680 F.3d at 1065 (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record").

Plaintiff argues that, although the ALJ found her obesity to be a severe impairment, he erred when assessing her RFC because he failed to consider the impact of her obesity on her ability to work.  This argument is unavailing.  Limiting her to light work and citing Social Security Ruling 02-1p, the ALJ found that her obesity did not "impose substantial limitations with mobility and stamina or significantly exacerbate [her] other medical conditions."  (R. at 24.)

Under Social Security Ruling 02-1p, obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  S.S.R. 02-01p, 2000 WL 628049, *4 (S.S.A. Sept. 12, 2002).  "There is[, however,] no specific level of weight or BMI [body mass index][40] that equates with a 'severe' or a 'not severe' impairment."  Id. (footnote added).  The regulations provide that:

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual

---

[40]Plaintiff states that her BMI is 35; at time of her application, it was 37.8.  Both are in the range of obesity.

functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpart P, Appx. 1, § 1.00(Q).

In **Myers**, 721 F.3d at 527, the Eighth Circuit rejected an argument that the ALJ erred by failing to consider the claimant's obesity and breathing limitations when determining the claimant's RFC. As in the instant case, the ALJ had included obesity among the claimant's severe impairments. **Id.** at 523. His RFC determination limited the amount of weight the claimant could lift and the length of time during an eight-hour day when she could stand and walk. **Id.** at 526. In **Heino v. Astrue**, 578 F.3d 873, 881 (8th Cir. 2009), the Eighth Circuit recognized its previous holding "that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." The court then rejected the claimant's argument that the ALJ had failed to consider her obesity when determining her RFC. **Id.** See also **Green v. Astrue**, 2011 WL 749743, *20-21 (E.D. Mo. 2011) (finding that ALJ properly considered claimant's obesity by considering all her medical records and symptoms in light of obesity and concluding that impairments did not meet requirements of listing).

In the instant case, the ALJ found Plaintiff's obesity to be a severe impairment, cited Social Security Ruling 02-1p, limited the amount of weight she can lift, and limited the frequency of certain exertional activities, e.g., stooping and kneeling. In the instant case, this is sufficient to avoid reversal. See **Yarbrough v. Astrue**, 2012 WL 3235747, *3-4 (E.D. Ark. 2012) (finding that ALJ's citation to Social Security Ruling 02-1p, his statement that he had

to consider at step three whether the combination of claimant's impairments satisfied a listing, and summary of alleged impairments, including obesity, satisfied requirement that ALJ consider combined effect of impairments, including obesity).

Mental Impairment.  In her final assignment of error, Plaintiff argues that the ALJ erred by not finding her mental impairment satisfies Listing 12.04 (affective disorders) or 12.06 (anxiety disorders).  In support of her argument, Plaintiff focuses on her GAF scores within the 41 to 50 range, indicative of serious symptoms.  "The claimant bears the burden of demonstrating that [her] impairment matches all the specified criteria of a listing." **McDade**, 720 F.3d at 1001.  For the reasons set forth below, she has failed to do so with respect to either Listing 12.04 or 12.06.

Plaintiff's GAF scores ranged from 45 to 55, indicative of moderate symptoms, to 65, indicative of mild symptoms.  The lowest, 45, was assigned four times by a treating psychiatrist, Dr. Brockman, and once by an examining consulting psychologist, Dr. Peaco.  The next lowest, 50,  was assigned once by a psychologist, Dr. Caputy, conducting an intake screening for the Arthur Center.  A 53 was assigned once by an Arthur Center psychologist.  A 55 was assigned by an examining consulting psychologist, Dr. Froman.  And a 65 was assigned twice by a treating psychiatrist, Dr. Syed.  Although Plaintiff contends that the ALJ "cherry-picked" the records, see Plaintiff's Brief at 11, Plaintiff emphasizes only her GAF scores between 45 and 50.

"The [GAF] score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning."  **Jones**, 619 F.3d at 973 (internal quotations

omitted). "[T]he Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." **Id.** at 973-74 (third alteration in original) (internal quotations omitted). Thus, "an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." **Id.** at 974 (internal quotations omitted). In the instant case, the ALJ did just that. The record before him reflects that Plaintiff attributed her depression and feelings of sadness and hopeless to a bad divorce, then met and lived with a boyfriend, and engaged in outdoor activities. Her lowest GAF, 45, was assigned by Dr. Brockman, who consistently described as being cooperative; having a normal mood, speech and thought content; and having an appropriate affect, logical flow of thought, and fair insight and judgment. The first GAF of 45 was assigned by Dr. Brockman three days after Plaintiff informed her case worker that she was doing well. At the time, Plaintiff reported being under stress because she was moving. When next meeting with Dr. Brockman, Plaintiff reported that she had moved and was happier. Still, her GAF was 45. At the third meeting with Dr. Brockman, she was coping and doing well. She did not have any symptoms of, among other things, anxiety and depression. Still, her GAF was 45. At the fourth, and last, meeting, Plaintiff was caring for a friend. Her GAF remained at 45.

Plaintiff also challenges the ALJ's decision to give weight to Dr. Froman's opinion and not those of Drs. Peaco and McDonald. She places all opinions on the same level, i.e., rendered by one-time evaluating consultants. "It [is] the ALJ's task to resolve differences

between . . . consultative evaluations in light of the objective evidence." **Dipple**, 601 F.3d at 836. The ALJ gave Dr. Froman's opinion more weight than the opinion of either Dr. Peaco or Dr. McDonald because he found it to be "consistent with the medical course of [Plaintiff's] impairments as reflected in the medical records as a whole." (R. at 30.) This decision is supported by a careful review of the administrative record. Additionally, the Court notes that the ALJ did include in his RFC the limitation found by Dr. Peaco that Plaintiff could understand and remember simple instructions.

Plaintiff correctly notes that a finding of disabling mental illness may be made when there is only sporadic mental health treatment. (Pl.'s Br. at 13.) Such treatment may also, as it does in the instant case, reflect that the mental illness is not as disabling as alleged. Indeed, Plaintiff herself characterized her mental illness as not disabling when being evaluated by Dr. Froman, and he agreed.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of July, 2014.